Case number 19-2410 Abdullah Haydar v. Amazon Corporate LLC et al. Oral argument, 15 minutes per side. Mr. Michaels for the appellant. Good afternoon, ma'am. Let me welcome you first. We welcome you to the United States Court of Appeals for the Sixth Circuit. We appreciate you doing argument by an online version and want you to know that Judge Nell Bandian and I are here on video and Judge Batchelder is here only on audio. So you may have questions from any of the three of us. Now, please begin your argument. Thank you, Your Honor. Joseph Michaels on behalf of Plaintiff Appellant Abdullah Haydar. And if it's okay with the court, I'd like to reserve three minutes of my time for rebuttal. Certainly. As the court is aware, this is an district court improperly dismissed many of Plaintiff Appellant's claims at the summary judgment stage by viewing facts in the light most favorable to Amazon rather than plaintiff. Then following that summary judgment ruling, the court issued a series of rulings in limine which prejudice plaintiff's ability to cogently present a case at trial. I'd like to start today with the court summary judgment ruling. And in particular, it's ruling that no reasonable jury could find a genuine issue of material fact on plaintiff's Title VII and ELCRA retaliation claims. As in any retaliation case, first, you have to establish some protected activity under the relevant statute. Here, for purposes of the summary judgment record, protected activity cannot reasonably be in dispute. On March 5, 2015, plaintiff had a phone call with Shelley Serio, who at the time was the VP of HR for Amazon over the entire marketplace organization where plaintiff worked, and complained that his boss's boss, I believe Peter Farrisee, had made comments about his ethnicity and his religion and how he treated his wife based upon his ethnicity and religion. Let me ask you a timing question. Yes. Are you arguing that Mr. Hadar engaged in protected activity before February 10 of 15? Because it seems clear to me that the termination was on the table because defendants settled on the PIP that resulted before that February 24 email to Sherry Serio. And then obviously before the March 5 conversation with her. Is that a correct timeline? Yes and no, Your Honor. Termination or a managing out had been discussed. That was specifically rejected. On February 20, there was an email from Ms. McVeigh that stated that they were not going to terminate plaintiff and that there would be a performance improvement plan. Amazon's policy. The question becomes, my question, perhaps not clear enough, is that termination was on the table and they instead instituted a PIP, which could also result in termination. And weren't those all on the table before the February 24 email to Serio? A PIP was certainly on the table. A termination was specifically rejected. So under the Montel, the diversified clinical services case, which is 757 F 3rd 497, you have to look at the contemplated employment action before the protected activity and compare it to the contemplated action after. There had been some discussion in the OLR. Peter Farrisee actually said, no, we did not discuss managing amount. That was not on the table in that February meeting. That was Mr. Farrisee's testimony. Ms. McVeigh, the HR representative, specifically says we need to give him a chance to improve his performance. And a performance improvement plan does not necessarily Amazon lead to a termination. It is meant to improve performance. So we have clear documentary evidence that as of February 20th, when Ms. McVeigh sent that email, that plaintiff was not down the road towards termination. Now after that February 5th, or excuse me, March 5th phone call with Shelly Serio, eight weeks later, we have the EB email. The email that we cite in our brief between Mr. Beery and Mr. Farrisee. So establishing that he had not been, that no termination decision had been made, that the plan was to go for a PIP. By eight weeks later in late April, when that email was sent, the PIP had not even been administered yet. The PIP, which again is to improve performance, had not even been delivered to plaintiff. And yet in that email, Mr. Farrisee and Mr. Beery are discussing reaching a good outcome like the EB case. EB is an L6 from a different part of the organization with different supervisors. The only thing in common between Mr. Hadar and the EB case is that EB also engaged in protected activity under Title VII. And this goes to the district court found a timeline we think that construed the facts in favor of Amazon. The district court found that because there was a six month gap between that March 5th protected activity and his ultimate termination in September, that no reasonable jury could find retaliation here. And we just respectfully disagree with the district court on that point. What about the time that elapses from the protected activity to the termination? Well, we believe that that April email, the April 29th email, evidences an intent to retaliate. And if you read that email closely, it mentions it won't be quick and it mentions that we need to follow a buttoned up process. So you're saying that temporal proximity is from March 5th to late April? Exactly, Your Honor. And to make a point on temporal proximity, the standard temporal proximity case, you have some protected activity and then an unrelated policy violation or rule violation, which leads to a termination. And just the mere fact that time can create an inference of retaliation. Here we have, as Your Honor pointed out, about a seven to eight week between March and April temporal proximity between the termination decision. But that email itself also references the allegations. That email itself provides clear evidence. It mentions a series of allegations against leadership. It mentions that we need to follow a buttoned up process. It mentions that it won't be quick. And it mentions that we need to handle it like EB, who was terminated two weeks before and had complained of sexual harassment, another Title VII protected activity. So you've got evidence in the record that this was an eight week at most between a decision to terminate, again, before the PIP had even been administered and the protected activity. And you've got a direct reference to these allegations that provides additional evidence above and beyond the standard temporal proximity alone. When you say a direct reference to these allegations, you're not saying to any allegations about ethnic or religious discrimination, are you? You're saying the allegations that he was being treated unfairly generally by the company? Well, the email says, given the series of allegations against the leadership team, that's what Mr. Beery referenced. We believe that that shows a clear reference to the allegations that he made to Shelley Serio in that March 5th phone call. So it ties it directly to the allegations. These allegations were- But it's not even clear, is it, that he, and I understand the summary judgment. So we have to take the evidence in the light most favorable to the non-moving party. But it's not exactly clear that he's complaining about invidious discrimination, is it? I mean, he's obviously complained throughout his entire career at the company that he's being treated unfairly. But it's unclear to me that he's saying it's because of his religion, is it? On that March 5th phone call, I think it's extremely clear. Both parties to that phone call typed up notes. Mr. Hadar referenced that Mr. Farsi believed he, quote, had an inherently bad relationship with his wife due to his ethnicity and religion. That's record entry 68-124, page 8640. And Shelley Serio's notes mentioned some talk of bias. And she even in her deposition said, I thought he was alleging religious or ethnic bias. And I asked him what that was, and he said something else. So that's a clear fact dispute, as Your Honor pointed out. In our view, that's a clear, Shelley Serio says one thing, he says another, and the jury should have been able to make that call. And the district court, by relying on this six-month temporal proximity gap, prevented the jury from doing its ultimate job of fact-finding that particular dispute. Moving on, unless there's any further questions on the timeline or temporal proximity, we do have additional evidence, I think, of retaliation in the form of comparator evidence. At Amazon, and this is important to understand plaintiff's performance both before and after protected activity, employees receive 360 feedback from their peers, their subordinates, their bosses, everybody. That then gets put into a performance review by the supervisor. That review has both areas to improve and strengths. So everybody is going to receive some bad feedback, some good feedback. When Amazon talks about plaintiff, you know, having these problems, interrupting, our theory of the case, both in the discrimination at trial and in retaliation, is that those were actually rewarded at Amazon. That Amazon is a place for hard-charging people who break a few eggs to make an omelet, and that was rewarded. And we had comparator after comparator of individuals who had the same types of areas for growth that Amazon made such a big deal out of with plaintiff, and were not terminated. And we had David Keller, Dave Nadel, Joe Trellin, Jonathan Shakes, Matt Yates. And at the summary judgment stage, the existence of those comparators also provides further inference that a reasonable jury could find, hey, Mr. Hadar was retaliated against here because these performance issues would not, were not such a big deal with people who had not engaged in protected activity. And one area I think the district court got their analysis right was on page 39 of the opinion, where the district court acknowledges that Hadar's performance was actually pretty good or borderline up until that 2014. His first boss had rated him highly, Jim Jodry, in the 2014 review. And in the 2014-15 review, his boss had rated him an exceeds, as a preliminary matter, an exceeds employee, which would have automatically guaranteed him a highly valued rating. So it's not true in our view that these types of leadership principles or these areas to improve where individuals in the 360 feedback say that somebody has these types of further additional evidence that a jury could find retaliation and the jury just simply wasn't given that opportunity. And with that, I will reserve the remainder of my time. Waiting for the clock to flip. Good afternoon. May it please the court, your honors, Michael Chichester for defendants appellees. The court should affirm the district court's grant of summary judgment on plaintiff's retaliation and marital status discrimination claims and the discovery and evidentiary issues from which plaintiff appeals. In this employment case, plaintiff had a full and fair opportunity to conduct discovery. He took the depositions of 14 fact witnesses and make his case in summary judgment, including through supplemental briefing. The trial court in an extensive and academic opinion correctly concluded that plaintiff's retaliation and marital status claims failed as a matter of law. At trial, plaintiff stipulated to the dismissal of his former managers, Joel Mosby and Garrett Gaw. And when the case was submitted on plaintiff's national origin and religious discrimination claims, the jury found them lacking. In each instance of discovery or evidentiary issue arose, the trial court painstakingly studied the issue and issued fair rulings within its discretion. In addition, plaintiff's claims of evidentiary errors are undercut by plaintiff's own tactical decisions. This is a pretty straightforward case, and because plaintiff found no success in the trial court, he's changed tact and is now advancing arguments not raised below and otherwise distorting the trial court's rulings. For example, plaintiff now claims the decision to terminate his employment was supposedly made on April 29, 2015, and that's contrary to the theory plaintiff argued on summary judgment before the jury and before this court. In addition, plaintiff claims that in its summary judgment opinion, the trial court found pretext on his national origin and religious discrimination claims, but not his retaliation claim. However, in its 51-page opinion, a pretext discussion doesn't appear until page 50 in the context of plaintiff's retaliation claim. That's because the court here decided the national origin and religious discrimination claims under a mixed motive standard, which did not require the court to walk through the McDonnell Douglas burden shifting analysis and determine pretext. Presumably, plaintiff opted to argue mixed motive because his direct replacement was also Syrian-American and also Muslim. Plaintiff also seemingly claims the trial court denied him the ability to take Jeff Bezos's deposition. Of course, defendants would have opposed it, but plaintiff never pursued that issue to a decision before the trial court. You'll find no order in the record on a motion to compel our motion for protective order regarding Jeff Bezos's deposition. Suffice it to say... Yes. Let's go back to this question about what was on or off the table at the time that Hadar talked to Syria in March. Was termination off the table? Was it still on the table? What's the evidence there? The evidence was that when Garrett Gaw communicated to plaintiff what his rating was going to be, that it was going to be the second time he was rated least effective at Amazon. Garrett Gaw's intent was to put him on a performance improvement plan, and that is standard at Amazon. When you have year-over-year least effective ratings, the lowest rating at Amazon, you'll be put on a performance improvement plan. There was discussion about a termination option at that point in time, but Mr. Hadar had not been on a formal performance improvement plan prior. This managed out notes or whatever, you can't manage somebody out without having them on a performance plan first. Is that right? I don't necessarily agree with that concept, but in this case, the determination at that point in time was from human resources and his own management that he was going to be placed on a performance improvement plan prior to his phone call with Shelley Serio on March 5th, 2015. On a retaliation claim, we're looking for causation. This court held just last fall that to establish a causal connection between the protected conduct and the adverse employment action, a plaintiff must present sufficient evidence to raise the inference that his protected activity was the likely reason for the adverse action. On that dispositive issue then, the test is whether a reasonable jury could find, but for his March 5th, 2015, supposed oral complaint to HRVP Shelley Serio, that his supervisor, Garrett Gaw, would not have terminated his employment. He didn't make that showing in the trial court, and he can't do so here. There's three separate reasons why. I've referenced timing to some degree now, but the timing of the first point is timing of plaintiff's placement on the performance improvement plan. The second is his, at best, weak evidence of protected activity, and the third is the absence of knowledge of the decision makers of the supposed protected activity. On the timing point, this was plaintiff's trajectory. As of his interim review in May 2013, given to him by Ramya Kondasamy, he was given pretty harsh criticism and advised that he needed to conform his behaviors to Amazon's expectations concerning leadership principles. In 2014, he did, didn't he? Didn't the evidence show that he then began to conform his behavior? And then when he transferred, I believe, was it to Detroit? I'm trying to remember the timeline on Detroit. He supposedly did a pretty bang-up job there, didn't he? Briefly, Your Honor, and he received a least effective rating in 2014. He was on a better trajectory when Joel Mosby was managing him for most of the year. To use a euphemism, the wheels came off over an employee transfer situation in the fall that demonstrated to Joel Mosby that everything he had been trying to coach Mr. Haderon had not been successful, and he reverted back to his... I'm sorry, this is in late 2014? This is in late 2014. Okay. That's correct. That's correct. I'm sorry. Thank you, Your Honor. In 2015, he received the same least effective overall performance rating. That's the February... Well, we know we have some of this back and forth that it wasn't like everyone agreed initially least effective is what it's going to be. They actually changed some of his reviews, didn't they, in order to keep him in the least effective category? In 2014, and it's important to understand how Amazon's performance evaluation system worked, it's presented at one meeting, and then the leader takes that to the next meeting. In 2014, for that rating, I believe his initial rating was barely going to be valued performer, I think, is the second to the bottom. And when that was presented, Mr. Haderon also gets to participate in an OLR meeting about his direct reports. And in his meeting, his peers commented that he reverted back to the same behavior, tried to overpower the discussions. And then when we get to 2014, to the final OLR, his rating does turn out to be least effective. I don't believe that that's necessarily relevant to Mr. Haderon's retaliation claim. But he was arguing throughout that that was evidence that somehow Mr. Farrisee had some sort of dislike of plaintiff. Well, Mr. Farrisee had some things to say that would make a plaintiff think he didn't like him, didn't he? If you're referring to the coaching comment, the keep your head down, your mouth shut, and do your job comment in the email following Mr. Hadar being invited to attend an off-site event, Mr. Farrisee testified that that was intended to be helpful criticism for Mr. Hadar. Well, what about his religious discriminatory comment, regular comments, you know, about treating his wife better and that his poor wife is there all alone, which had some indications that it related to Mr. Hadar's religion? Your Honor, I would say that those were strongly disputed, that Mr. Hadar, that the district judge denied some re-judgment on the national origin and religious discrimination claims based on the mixed motive theory, and that plaintiff got a jury on that issue and the jury rejected it. But the performance improvement plan was the natural consequence of the consecutive least effective ratings. And as we've stated, there was a greater than six-month interval between plaintiff's supposed complaint to Shelley Cereo and his place and his eventual termination from employment. I need to talk about plaintiff's supposed evidence of protected activity. Reliably, plaintiff escalated every time he received a rating that he didn't like. The opposition clause of Title VII requires more. It requires an overt stand against suspected illegal discriminatory action. This plaintiff never did that in writing, not even when a lawyer drafted a letter on his behalf in August of 2015 or in the emails that he sent to Jeff Bezos. It really comes down to one supposed equivocal oral complaint to Shelley Cereo in that March 5, 2015 phone call. And if he did reference national origin or religious discrimination in that call, that's not how Cereo interpreted it. It's also not mentioned in plaintiff's follow-up email. What did he say? What are we supposed to do with that on summary judgment, though? We view the facts and light in the light most favorable to him. What did he say in his depo? Has he filed an affidavit? That's what we have to look at, right? Absolutely, Your Honor. For plaintiff establishing or arguing that he has engaged in protected activity, yeah, his testimony can create a disputed material fact on that point. But it goes to the knowledge of the decision-maker. And here, Shelley Cereo in her notes says that HADAR reported to her it's not racial or anything like that, bias that nobody stands up for me. And then HADAR in his follow-up email, plaintiff in his follow-up email on March 5 says, Ferestein is directs and the entire leadership team need to be coached on accepting severely flawed and biased performance data and prioritizing their relationship building amongst each other at the expense of anyone who is not part of their inner circle, which is why I mentioned their bias against me and treating me poorly since no one from their inner circle was standing up for me when being treated unfairly. Cereo, for her part, didn't recognize that plaintiff was complaining about unlawful discrimination. So how do we impute that to the decision-maker in the termination decision that he had knowledge that plaintiff had engaged in protected activity? Not even Shelley Cereo knew that plaintiff was supposedly complaining about national origin or religious discrimination. What about the investigation by counsel? Yeah. Did that not turn up some of that information? It didn't. It didn't. And to the person who was charged with undertaking that interviewed the plaintiff twice. And it didn't, plaintiff did not make a claim that it was supposed to be based on his, supposedly based on his national origin or religion. So you're right, your honor. He did have further opportunities. I also need to, I think, let me ask you, your opposing counsel suggests that this attorney who investigated these complaints for Amazon has never found a complaint that was worth pursuing. Is that correct? No, that's not correct, your honor. That's not correct. That this investigator did? No. I don't have her testimony directly in front of me, but no, this investigator has found. And I think if the question was, have you ever found discrimination or, or I'm trying to remember what her answer, what her answer was. If it was, have you ever found a violation of Amazon policy, which prohibits discrimination on the Title VII protected classes? Yeah, absolutely. I believe that she would say, or that she did say that she has. Just briefly to address the September email that plaintiff sent to Mr. Bezos. It's once again, devoid of any claim of national origin or religious discrimination. And more importantly, plaintiff, the trial court correctly found that plaintiff had no evidence that Ms. Serio, Mr. Gar, Mr. Oler ever saw that. Regarding this new timing argument that somehow this April 29, 2015 email establishes or shortens the proximity between plaintiff being placed on performance improvement plan and his termination. It doesn't. A fair reading of that email says all that to say, we need to be buttoned up at every step with this one. It wouldn't be quick or easy. Let me ask you a question. Give me an idea of Gar versus Ferris. So you're saying Gar was the sole decision maker on the firing, right? Yep. Gar made the decision in consultation with Derek is not involved with the actual firing. Is that? No, that's accurate. That's accurate. So you're right. Peter Ferris, he, from our perspective, not part of this, but he had said something to Gar, like, I don't like this guy. We need to get him out of here, manage him out or whatever it is. I mean, I assume they would listen to him, right? Yes, but it's not anywhere in the much of that we'll get to a good outcome as quickly as possible. They asked the drafter of that email, Mike Beery, what a good outcome was at his deposition. And Mike Beery testified that a good outcome could be plaintiff improving and sustaining improved performance and remaining employed at Amazon. So I think it's, I don't believe that email is susceptible at all to plaintiff's interpretation that it somehow meant at that point in time that plaintiff would be who was in fact managed out is exactly the parallel that it was trying to use. I disagree with that. I believe that employee also more than plaintiff alluded to was a challenging employee as well. And it was not in reference to any complaints made by her. Regarding comparables, if I may, just for a moment, very briefly, regarding comparables plaintiff suggests that simply because he's attempted to identify comparables that he should surpass some re-judgment. He's identified the wrong trap, the wrong comparables and it's belied by his own brief. He says that comparables were always treated better. The track record of plaintiff's comparators was consistent negative and never resulted in any of discipline. So how can a supposed, how can suppose a differential treatment be probative of retaliation where plaintiff posits that the differential treatment was always prevalent both before and after the supposed protected activity? And the short answer is that it can't be. I know I'm out of my, out of time. Thank you. Sure. I appreciate the court's time for the reasons argued those stated in our brief and those stated in the record defendants appellants respectfully defendants appellees respectfully request that the court affirmed the district court's decision on summary judgment in regard to plaintiff's marital status and retaliation claims and the discovery and evidentiary rulings from which plaintiff appeals. Thank you. Are there further questions Judge Nalbandian or Judge Batchelder? I don't know. Okay. You have your rebuttal time, please, Mr. Michaels. Got it. First on the timeline discussion we were having earlier, I would like to draw the court's attention to that McVeigh email on February 20th. That is record entry 68-121. That is the email in which a performance improvement plan is contemplated rather than termination. So under the case cited earlier this is not something that's on the table and the April 29th in which they're discussing that good outcome which we believe a reasonable jury can certainly read that but the good outcome they're looking for is termination like EB who had been terminated two months before or two weeks before excuse me and in regards to counsel's pretext argument this is actually an area in which the district court got it right on the discrimination claim which she let go through the trial which she let the jury sort out and got it wrong on retaliation claim. On page 40 of her opinion the trial court actually states that that EB email says that a reasonable jury could find that the PIP was a quote and she uses the term mission impossible and that's the entire thrust of our argument in relation to that April email is that it wasn't a bona fide performance improvement PIP intended to improve somebody's Amazon. That EB email clearly means that it can be interpreted to be we want to get rid of this guy we got it we got to be buttoned up on it and it's not going to be quick and that the PIP was actually part of that process and the district court also discusses some moving goals that plaintiff was asked to identify people to talk with them to build trust plaintiff did that the goal post essentially moved throughout. What about the argument that Gaugh and Oler were not aware or the record doesn't show that they were aware of the protected activity and they were the decision makers? Well they were aware of the investigation each of those individuals were investigated or interviewed excuse me for the investigation and we respectfully disagree with counsel's assertion that Mr. Farrisee was not involved Mr. Farrisee regularly followed up on plaintiff's employment including in that April email even though at his deposition Mr. Farrisee claimed that he was not involved he sent an email in April asking about plaintiff and are we moving fast enough here was what Mr. Farrisee asked there was an August email update and then there was is there what is the link is it like a cat's paw theory what's the link between Gaugh therefore and the religious or ethnic allegation? I mean yes he's it was like is he when he's interviewed during the during the investigation does is he asked specifically about that or how does he know how would he know? Well it's not necessarily a cat's paw theory your honor because we believe Peter Farrisee was involved from beginning to end he overruled plaintiffs ratings twice and in fact this site is in our brief Mr. Farrisee was consulted up until the negotiating a potential severance for plaintiff he was consulted on whether security should be called on the termination a reasonable jury can find that Mr. Farrisee was involved in the termination Mr. Farrisee Barry the individual who Mr. Farrisee is emailing with is actually the boss of Derek Oler who's plaintiff's HR partner so this is the boss's jury could find Farrisee used Gaugh to insulate himself but was actively involved in retaliating against an employee who like EB claimed that that Mr. Farrisee had violated title seven and I see I'm out of time so if there are any further questions I would ask that for the reason stated in our briefing in argument the district court order be vacated. Well we thank you both for your arguments and your briefing you all have done a good job on an employment discrimination case and honestly they aren't always good jobs but but your briefing has been good the attention to detail as you could see from the length of the case that it went all the way through both summary judgment and to trial so I thank you both for for taking it seriously and doing a good job. We will take that case under advisement and an opinion will be issued in due course.